### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re: | |
| | Bankruptcy Case No. 20-17547 TBM |
| JOHN MATTHEW IKALOWYCH, | Chapter 11 (Subchapter V) |
| | |
| Debtor. | |

---

### MEMORANDUM OPINION AND ORDER ON CHAPTER 11 (SUBCHAPTER V) ELIGIBILITY

---

## I.      Introduction.

Congress recently made a major addition to Chapter 11 of the Bankruptcy Code[1]: the Small Business Reorganization Act of 2019 (the "SBRA").[2]  The SBRA (commonly referred to as "Subchapter V"), was designed to streamline the reorganization and rehabilitation process for small business debtors.  Substantively, the SBRA lowered the Chapter 11 bar for confirmation of a plan of reorganization by permitting confirmation even if all classes of creditors reject the proposed plan and by eliminating the so-called "absolute priority rule."  Procedurally, Congress simplified some of the more cumbersome aspects of standard Chapter 11 cases by eliminating unsecured creditors' committees and disclosure statements.  Suffice it to say that the SBRA offers many potential advantages for qualifying Chapter 11 debtors.

Last year, reacting to the Coronavirus pandemic, the Legislative Branch made further temporary changes, expanding SBRA eligibility through enactment of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").[3]  Under Section 1113(a)(1) of the CARES Act, effective for the period from March 27, 2020 to March 27, 2021, a small business "debtor" means:

> . . . [1] a person [2] engaged in commercial or business activities . . . [3] that has aggregate noncontingent liquidated secured and unsecured debts . . . in an amount not more than $7,500,000 . . . [4] not less than 50 percent of which arose from the commercial or business activities of the debtor.

---

[1]      All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

[2]      Pub L. No. 116-54, 133 Stat. 1079 (mainly codified at 11 U.S.C. §§ 1181-1195).

[3]      Pub. L. No. 116-136, 134 Stat. 281, 310-12 (2020).

11 U.S.C. § 1182(1)(A).  Last month, Congress extended the effectiveness of the foregoing SBRA eligibility provision for another year (through March 27, 2022).[4]

This dispute raises a difficult and novel issue regarding who can use the new SBRA, as modified by the CARES Act.  In this bankruptcy proceeding, an individual debtor, John Matthew Ikalowych (the "Debtor"), filed for protection under Chapter 11 and elected Subchapter V.  Just before he filed his bankruptcy case, the Debtor started a new job selling commercial insurance products for a company he does not own or control.  But, for years, he has been an entrepreneur.  He wholly-owns a limited liability company, JMI Management, LLC. ("JMI"), which he uses  as a "pass-through" entity for certain business interests.  JMI, in turn, owns a 30 percent interest in a second limited liability company, Lyceum Hailco, LLC ("Hailco"), which operated an automotive hail repair business.  The Debtor worked for and managed Hailco.  Hailco experienced financial difficulties shortly before the Debtor's bankruptcy filing.  As a result, it "cease[d] operations and surrender[ed] all of its assets."  The failure of Hailco triggered the Debtor's own bankruptcy because he had personally guaranteed most of Hailco's debts.  Hailco's failure also forced the Debtor to switch jobs to earn a living.  However, in fulfillment of his management duties to Hailco, the Debtor continued to perform a modest amount of "wind down" work for Hailco both before and after the Debtor's bankruptcy petition.

The United States Trustee (the "UST") objected to the Debtor's designation and eligibility under Subchapter V of Chapter 11.  The UST contends that the Debtor is not eligible to be a small business debtor because the Debtor was not "engaged in commercial or business activities" when he filed for bankruptcy.  The Debtor contests the UST's objection and asserts that he is eligible to be a Subchapter V debtor by virtue of his full ownership of JMI and indirect ownership of Hailco, as well as his "wind down" work for Hailco.  In the end, the dispute boils down to whether the Debtor qualifies as "a person engaged in commercial or business activities" within the meaning of Section 1182(1)(A) and eligible to be a debtor in Subchapter V.

## II.   Jurisdiction and Venue.

This Court has jurisdiction to enter final judgment on the eligibility issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334.  Eligibility for relief under Chapter 11 (Subchapter V) is a core matter under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate) and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4]    *See* COVID-19 Bankruptcy Relief Extension Act of 2021, Pub. L. 117-5 (Mar. 27, 2021).

### III.    Procedural Background.

#### A.    The Bankruptcy Filing and Subchapter V Election.

The Debtor filed for protection under Chapter 11 of the Bankruptcy Code on November 20, 2020 (the "Petition Date").[5]  In Section 12 of his Petition, the Debtor checked the "No" box in response to the question:  "Are you a sole proprietor[6] of any full- or part-time business?"[7]  In Section 13 of his Petition, the Debtor checked the "Yes" box in response to the statement:

> I am filing under Chapter 11, I am a debtor according to the definition in § 1182(1) of the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.[8]

The Court refers to the Debtor's decision to proceed under Chapter 11 (Subchapter V) as the "Subchapter V Election."  Later in his Petition, the Debtor characterized his debts as "primarily business debts."[9]  On February 5, 2021, the Debtor filed his "Sub-Chapter V Plan of Reorganization" (the "Plan").[10]  The Plan has not been confirmed.

#### B.    The Eligibility Objection, Response, and Joinders.

The UST objected to the Debtor's Subchapter V Election by filing the "U.S. Trustee's Objection to Debtor's Designation as a Subchapter V Small Business Debtor" (the "Eligibility Objection").[11]  The central thrust of the Eligibility Objection is the assertion that the Debtor is not "engaged in commercial or business activities" within the meaning of Section 1182(1)(A).  The Debtor's largest creditor, Sunflower Bank N.A. ("Sunflower Bank"), joined in the UST's Eligibility Objection and also contends that the Debtor may not use Subchapter V.[12]

The Debtor filed a "Response" to the Eligibility Objection, contesting the UST's position and arguing that the Debtor correctly elected to proceed under Subchapter V since he is "engaged in commercial or business activities" within the meaning of Section 1182(1)(A) (the "Response").[13]  The Subchapter V Trustee, John C. Smiley (the "Subchapter V Trustee"), agrees with the Debtor and joined in the Debtor's Response.[14]

---

[5]    Ex. 1; Stip. Fact No. 1.
[6]    Section 12 of the Petition states:  "A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC."  Ex. 1 at 4.
[7]    Ex. 1 at 4 § 12.
[8]    Ex. 1 at 4 §13; Stip. Fact No. 1.
[9]    Ex. 1 at 6 § 16b.
[10]    Ex. 3.
[11]    Docket No. 30.
[12]    Docket No. 45.
[13]    Docket No. 38.
[14]    Docket No. 46.

C.   **The Hearings.**

The Court conducted a preliminary non-evidentiary hearing on the Eligibility Objection, Response, and Joinders on February 19, 2021.[15]  Thereafter, the parties submitted their "Statement of Stipulated Facts," listing a set of eight stipulated facts (the "Stipulated Facts").[16]  However, the parties noted that they were unable to agree to certain additional facts proposed by the Debtor.  Accordingly, the Court conducted a second preliminary non-evidentiary hearing on March 11, 2021, during which the parties requested that the Court set the dispute for a trial.[17]  The Court agreed and conducted an evidentiary hearing on the eligibility issues on March 24, 2021.[18]  At the trial, the Court heard testimony from the Debtor and admitted into evidence the UST's Exhibits 1-7 and the Debtor's Exhibits A-D.  After the trial, the Court took the dispute under advisement.  The Subchapter V eligibility issues are now ripe for decision.

## IV.   **Factual Findings.**

Based upon the Stipulated Facts, the evidence presented at the trial (including the testimony of the Debtor and the admitted exhibits), as well as the Debtor's Petition, Statement of Financial Affairs, Schedules, and other record bankruptcy filings, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.

A.   **The Debtor's Employment on the Petition Date and Thereafter.**

As set forth below, the Debtor was employed by Hailco for several years and also served as one of the managers of Hailco.  He stopped working for Hailco sometime between September 26 and October 2, 2020[19], because Hailco was winding down its business and ceased operations.  The Debtor was unemployed for most of October 2020.[20]  Then, just weeks before the Petition Date (sometime between October 25 and November 7, 2020), he started as an employee with CCIG, an insurance brokerage company.[21]  The Debtor's role at CCIG is as a "Commercial Insurance Producer" selling commercial insurance products.[22]  The Debtor does not have an ownership interest in CCIG; instead, he is only an employee.[23]  CCIG pays the Debtor a monthly salary of about $11,250.00.[24]  The Debtor also may be eligible for a potential annual bonus.  The Debtor has continued to work at CCIG since the Petition Date.

---

[15]   Docket No. 57.
[16]   Docket No. 68.
[17]   Docket No. 72.
[18]   Docket No. 80.
[19]   Docket No. 4 at 2-4.
[20]   Ex. 3 at 5("The Debtor was unemployed at the time [October 8, 2020].").
[21]   Docket No. 4 at 1
[22]   Ex. 1 at 47; Stip. Fact No. 8.
[23]   Stip. Fact No. 8; Ex. 1 at 47.
[24]   Ex. 2.

B.      **The Debtor's Relationship with Lyceum Hailco, LLC**.

Hailco is a Colorado limited liability company that nformerly operated as an automotive hail repair business performing paintless dent repair.[25]  The management of Hailco is vested in managers.  The Debtor is one of the managers of Hailco.[26]  For several years prior to the Petition Date, the Debtor worked for Hailco.  However, he stopped working for Hailco between September 26 and October 2, 2020, because the entity failed financially.  At the same time (*i.e.*, in early October 2020), Hailco ceased operations and surrendered all of its assets to Sunflower Bank.[27]

In various filings made in his bankruptcy case, the Debtor asserted that he "owned" Hailco.  For example, in his "Subchapter V Status Report" and also in his Plan, the Debtor informed the Court and parties in interest that:

> The Debtor owned and operated a hail repair business, Lyceum Hailco, LLC located at 2452 S. Trenton Way, Unit F, Denver, Colorado 80231.  Due to COVID, a lack of hailstorms, and a significantly deficient payout on an insurance claim, Hailco was forced to cease operations and surrender its assets to its secured lender [Sunflower Bank].  The Debtor's bankruptcy filing was prompted by the Debtor's personal guarantee of a number of Hailco's obligations.  In addition, the Debtor was unemployed until just prior to the Petition Date.[28]

More specifically, he stated that he owned 30 percent of the membership interests of Hailco.[29]  The Debtor repeatedly has confirmed that the value of his equity in Hailco is "$0.0."[30]  Consistent with the Debtor's valuation of his minority interest in Hailco as worth "$0.0," Hailco's Balance Sheet shows that its liabilities far exceed its minimal assets so that there is no equity in the company.[31]

Notwithstanding, at trial, the Debtor testified that he does not actually own any of the membership interests in Hailco.  Instead, the Court finds that the Debtor's equity role in Hailco is indirect.  The Debtor wholly owns JMI, a Colorado limited liability company.  In turn, JMI — not the Debtor — owns a 30 percent membership interest in Hailco.  The Court did not receive any specific testimony concerning all the other persons or entities who own the remaining membership interests in Hailco.

In any event, starting prior to the Petition Date and continuing after the Petition Date, Hailco has been winding down its business and financial affairs (including by

---

| | |
|---|---|
| [25] | Stip. Fact No. 2; Docket No. 28 at 8. |
| [26] | Claim No. 3-1 at 11 and 17. |
| [27] | Stip. Fact No. 3. |
| [28] | Ex. 2; Ex. 3 at 2; *see also* Stip. Fact No. 3. |
| [29] | Docket No. 21 at 1 and 8. |
| [30] | Ex. 1 at 27; Ex. 3. |
| [31] | Docket No. 21 at 14; Ex. 3 at 3. |

surrendering all of its assets during October 2020).[32]  The Debtor has been assisting Hailco in its wind down, both prior to and after the Petition Date.  In terms of the actual activities the Debtor has performed for Hailco as part of the wind down of Hailco, the Debtor testified that he:

- Interacted with Hailco's lenders concerning Hailco's wind down;

- Interfaced with Hailco's landlord regarding Hailco's wind down;

- Helped with physical cleanup of Hailco's leased premises and turnover of the premises to Hailco's landlord;

- Assisted in addressing payroll issues for Hailco's former employees;

- Dealt with Form 1099 issues for Hailco's vendors;

- Communicated with Hailco's tax accountants;

- Interfaced with Hailco's bookkeeper regarding Hailco's PPP loan and final close-out of financials;

- Worked on Hailco's business records retention and storage (including transitioning Quickbooks files from a cloudbased system); and

- Considered Hailco's intellectual property and website issues.

The Court accepts that the Debtor performed such work, which the Court refers to as the "Wind Down Work."  However, the timing is a little vague.  The Debtor did not identify which specific parts of the Wind Down Work were performed before he filed for bankruptcy protection, and which occurred after the Petition Date.  The Debtor testified that he spent about 12 hours a month on the Wind Down Work and that he "forecasts" a future reduction in time on such projects.  The Debtor did not receive any compensation for his Wind Down Work.  The Debtor still is a manager of Hailco.  And, Hailco continues to exist as a Colorado limited liability company — it has not been dissolved under COLO. REV. STAT. §§ 7-80-801 *et seq.*

The Debtor's Plan does not contemplate the Debtor's receiving any income from Hailco nor taking any other action with respect to Hailco.[33]  Instead, the Debtor's main

---

[32]     Stip. Fact No. 4.
[33]     Ex. 3.

source of income for the Plan is from CCIG, albeit a small amount of income is projected from JMI.[34]

## C.    The Debtor's Relationship with JMI Management, LLC.

The Debtor formed JMI as a Colorado limited liability company in 2012 and owns 100% of the membership interests in JMI.[35]  The Court deduces that the "JMI" acronym stands for the Debtor's full name:  John Matthew Ikalowych.  In addition to wholly owning JMI, the Debtor also serves as the sole manager of JMI.[36]  The Debtor testified that he formed JMI as a business vehicle for his "non-W-2" income and work.  He repeatedly has confirmed that the value of his equity in JMI is "$0.0."[37]  JMI existed prior to the Petition Date and continues to exist after the Petition Date.[38]

From approximately 2012 to 2014 (or possibly 2015), the Debtor used JMI to provide property management services in relation to several units of leased residential real property.[39]  However, JMI has not provided property management services since 2014.  After 2012, the Debtor has served on the Board of Directors of Fairmount Cemetery, earning approximately $3,000.00 per year for that role.[40]  Although the Debtor, not JMI, serves on the Board of Directors of Fairmount Cemetery, he directed Fairmont Cemetery to pay his Board of Directors fee to JMI.  So, the Fairmont Cemetery income has been received by JMI and has flowed through from JMI to the Debtor.[41]  The reason for that arrangement is a bit unclear.  The Debtor testified that he was advised by a "tax accountant" to open JMI.

The Debtor's Federal Income Tax Return Schedule C for 2017 shows that JMI received $3,000.00 from Fairmont Cemetery.[42]  JMI's expenses were $5,382.00.  So, JMI generated a net loss of $2,382.00 in 2017.[43]  Something similar happened in 2018:  JMI received $3,000.00 from Fairmont Cemetery and the Debtor listed $4,526.00 as JMI's expenses, resulting in a net loss for JMI of $1,526.00.[44]  The next year, 2019, JMI also received $3,000.00 from Fairmont Cemetery.[45]  However, the Debtor (through JMI) claimed various expenses and a $21,642.00 depreciation deduction for a new model BMW X5.[46]  The result was that JMI asserted a $27,198.00 loss.[47]

---

[34]     *Id.*
[35]     Stip. Fact No. 5.
[36]     *Id.*
[37]     Ex. 1 at 27; Ex. 3.
[38]     Stip. Fact No. 5.
[39]     *Id.*
[40]     *Id.*; *see also* Exs. A-C (Federal Income Tax Returns Schedule C for 2017-2019 showing $3,000.00 annual payments to JMI on the Debtor's Tax Returns.)
[41]     Stip. Fact No. 5.
[42]     Ex. A.
[43]     *Id.*
[44]     Ex. B.
[45]     Ex. C.
[46]     *Id.*
[47]     *Id.*  The BMW X5 tax write-off by JMI seems odd since the Debtor claimed that he owned the vehicle on his Schedule A/B and asserted a personal exemption in the car on his Schedule C.  (Docket

The Profit and Loss Statement for JMI for the period of January 1, 2020, through December 3, 2020, included with the Debtor's "Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest,"[48] shows the following receipts and disbursements for JMI during that period:

| Lyceum HailCo Management Fees | $  7,470.05 |
| Fairmount Cemetery Board Fees | $  3,000.00 |
| | $ 10,470.05 |
| Distributions to John Ikalowych | $(10,470.04) |
| Remaining Balance: | $       0.01 |

So, JMI received some income from Hailco. The Periodic Report also states that "[t]here is no balance sheet for JMI Management, LLC as it is a pass-through entity."[49]

JMI has not been dissolved under COLO. REV. STAT. §§ 7-80-801 *et seq.* Instead, the Debtor apparently intends for JMI to engage in some business. Several months after the Debtor filed for bankruptcy protection, JMI entered into a "Business Consulting Agreement" with SkyHelm pursuant to which JMI agreed to provide certain business consulting services to SkyHelm for $2,500.00.[50] The Debtor signed the agreement as Managing Member of JMI. JMI has not received any payments from SkyHelm in relation to the new contract yet. The Plan does not contemplate the Debtor's receiving any income from JMI or taking any other action with respect to JMI, except that the Debtor apparently expects to receive $2,100.00 per year as a "dividend" from JMI for the $3,000.00 Board of Directors fee that JMI receives from the Fairmont Cemetery.[51]

## D.   **The Debtor's Debts**.

On his Schedules, the Debtor identified just fifteen creditors holding aggregate claims totaling $7,396,750.09.[52] In terms of the type of debt owed by the Debtor, he states that eight of his creditors hold claims for "business debt of Lyceum Hailco, LLC that Debtor guaranteed."[53] As explained previously, the Debtor has an indirect minority equity interest in Hailco through his ownership of JMI. The Debtor's largest creditor is Sunflower Bank. According to the Debtor, he owes Sunflower Bank $4,328,789.00, which amount is not contingent, unliquidated or disputed.[54] Sunflower Bank submitted a Proof of Claim (Claim No. 3-1) in a slightly higher amount: $4,364,744.99. The Sunflower Bank debt is based upon a loan to Hailco which was guaranteed by the Debtor and secured by the assets of Hailco as well as by the Debtor's membership

---

No. 1 at 25 and 33.) It is all a bit confusing, but probably not of great moment for purposes of the current dispute.

[48]   Docket No. 21 at 17.
[49]   *Id.* at 4.
[50]   Ex. D.
[51]   Ex. 3 at 24.
[52]   Ex. 1 at 22-42.
[53]   *Id.* at 17-21.
[54]   *Id.* at 20, 35.

interest in Hailco.[55]  There are seven other creditors who also have claims based upon the Debtor's guarantee of Hailco debt.  Altogether, the claims against the Debtor premised on the Debtor's guarantee of Hailco debt total $6,388,756.03.[56]

### E.      The Debtor's Post-Bankruptcy Monthly Operating Reports.

In his "Monthly Operating Report for Small Business Under Chapter 11," for the month of November 2020 (the "November 2020 MOR"), the Debtor was asked:

> Did the business operate during the entire reporting period?
>
> Do you plan to continue to operate the business next month?
>
> Did you pay your employees on time?
>
> Have you deposited all the receipts for your business into debtor in possession (DIP) accounts?[57]

The Debtor answered "N/A [Not Applicable]" to all of the foregoing questions.  The November 2020 MOR shows that the Debtor received income from only CCIG every two weeks.[58]  The November 2020 MOR also shows that the Debtor did not pay any expenses for operating a business.[59]  Instead, all of the Debtor's significant monthly expenses appear to be for typical consumer-type living expenses; such as food, clothing, telephone, and medical expenses.  The Debtor attached an explanation to the November 2020 MOR explaining why he was not earning business income or paying business expenses.  He wrote:  "Lyceum Hailco was shut down the end of September [2020] and has not operated since."[60]  He also noted that "I recently started working" at CCIG.[61]

In his "Monthly Operating Report for Small Business Under Chapter 11," for the month of December 2020 (the "December 2020 MOR"), the Debtor answered the Business Operations Questions the same way as the November 2020 MOR.[62]  And again, the December 2020 MOR shows that the Debtor received income (salary) from only CCIG every two weeks.  He had no other business income and no business expenses.[63]

In his "Monthly Operating Report for Small Business Under Chapter 11," for the month of January 2021 (the "January 2021 MOR"), the Debtor answered the Business

---

[55]     Ex. 1 at 20, 35; Claim No. 3-1; Stip. Fact No. 2.
[56]     *Id.*
[57]     Ex. 4 at 1.
[58]     *Id.* at 6-10.
[59]     *Id.*
[60]     *Id.* at 25.
[61]     *Id.*
[62]     Ex. 5.
[63]     *Id.*

Operations Questions the same way as the November 2020 MOR.[64]  And again, the January 2021 MOR shows that the Debtor received income (salary) from only CCIG every two weeks.  He had no other business income and no expenses.[65]

## V.   <u>Legal Analysis</u>.

### A.   <u>Statutory Framework for Subchapter V Eligibility</u>.

The Court's eligibility analysis starts — as it must — with the text of the applicable statute.  Section 1182 defines the term "debtor" in Subchapter V cases:

> (1) Debtor.  The term *"debtor"* —
>
>> (A) subject to subparagraph (B), *means a person engaged in commercial or business activities* (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) that *has aggregate noncontingent liquidated secured and unsecured debts* as of the date of the filing of the petition or the date of the order for relief *in an amount not more than $7,500,000* (excluding debts owed to 1 or more affiliates or insiders) *not less than 50 percent of which arose from the commercial or business activities of the debtor*; and
>>
>> (B) does not include —
>>
>>> (i) any member of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $7,500,000 (excluding debt owed to 1 or more affiliates or insiders);
>>>
>>> (ii) any debtor that is a corporation subject to the reporting requirements under section 13 or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78*o*(d)); or
>>>
>>> (iii) any debtor that is an affiliate of an issuer, as defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c).

11 U.S.C. § 1182 (emphasis added).

---

[64]   Ex. 6.
[65]   *Id.*

So, structurally, Section 1182(1)(A) identifies who generally qualifies as a Subchapter V debtor.  Then, Section 1182(1)(B) lists exceptions to the general rule.  The exclusions in Section 1182(1)(B) are not applicable in this dispute because the Debtor is not a "member of a group of affiliated debtors," not a "corporation" subject to reporting requirements under 15 U.S.C. §§ 78m or 78o(d), and not an "affiliate of an issuer" under 15 U.S.C. § 78c.  Thus, in this case, the eligibility focus rests exclusively on Section 1182(1)(A).[66]

The Section 1182(1)(A) statutory text lists four discrete requirements for Subchapter V eligibility.  Changing the order just slightly for ease of legal analysis, the mandatory elements are:

(1)     the Debtor must be a "person";

(2)     the Debtor's aggregate debt as of the Petition Date must not exceed $7,500,000;

(3)     the Debtor must be "engaged in commercial or business activities"; and

(4)     50% or more of the Debtor's debt must have arisen from "the commercial or business activities of the [D]ebtor."  *Id*.

The Debtor bears the burden to prove his eligibility under Subchapter V. *In re Sullivan*, ___ B.R. ___, 2021 WL 1250805, at *2 (Bankr. D. Colo. Mar. 30, 2021).  *Cf. First Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 705 (10th Cir. 2014) ("Debtors had the burden of establishing their eligibility for Chapter 12 relief."); *Hamilton Creek Metro. Dist. V. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1384-85 (10th Cir. 1998) (debtor bears burden to show eligibility under Chapter 9 of Bankruptcy Code).  The Court will consider each of the mandatory elements in turn.

**B.     The Debtor Meets the "Person" Requirement.**

The first Section 1182(1)(A) requirement is that the Debtor must be a "person."  In Section 101(41), Congress defined the term "person" as:  "includes individual, partnership, and corporation . . . ."  Under such definition, the Debtor is a "person."  Neither the UST nor Sunflower Bank suggests otherwise.

---

[66]     In its arguments at the evidentiary hearing, Sunflower Bank argued that the Debtor was not eligible to be a Subchapter V debtor because it was not he, but Hailco, that was engaged in "commercial or business activities."  Therefore, Sunflower Bank argued, the Debtor could qualify to be a debtor under Subchapter V only if Hailco filed for bankruptcy, thereby rendering the Debtor an "affiliate of such person that is also a debtor," as provided in Section 1182(1)(A).  Sunflower Bank's argument was creative; however, since the Court determines that the Debtor himself was engaged in "commercial or business activities" for his benefit as well as the benefit of Hailco, the "affiliate of such person that is also a debtor" parenthetical — whatever it might mean —is inapposite to the case at hand.

Case:20-17547-TBM   Doc#:93   Filed:04/15/21   Entered:04/15/21 16:20:22   Page12 of 26

C.    **The Debtor Satisfies the $7,500,000 Debt Cap**.

Section 1182(1)(A) contains a debt cap mandating that the Debtor's "aggregate noncontingent liquidated secured and unsecured debt" as of the Petition Date is "not more than $7,500,000." On his Schedules, the Debtor identified just fifteen creditors (of all types, including secured, unsecured priority, and unsecured) holding aggregate claims of $7,396,750.09. That amount of debt is remarkably close to $7,500,000. But even without considering which debts are "noncontingent" or "liquidated," the total still is below the $7,500,000 limit. As an additional check, the Court consulted the Debtor's official Claims Register. Very few creditors filed claims so far. But, the balance remains lower than the $7,500,000 threshold. Neither the UST nor Sunflower Bank contests that the Debtor's aggregate debt falls below the debt cap. So, the Debtor meets the Section 1182(1)(A) debt limit.

D.    **The Debtor Passes the Two "Commercial or Business Activities" Requirements**.

Section 1182(1)(A) contains two additional, separate but closely related, elements both utilizing the same phrase: "commercial or business activities." First, the Debtor must be a person "engaged in commercial or business activities." Second, "not less than 50%" of the Debtor's "aggregate noncontingent liquidated secured and unsecured debts" must have arisen from "the commercial or business activities of the [D]ebtor."

Since these two discrete elements contain a common phrase, the Court has grouped the requirements together for legal scrutiny. And, besides, both mandates are very closely linked in how they operate. The first element establishes a general requirement: the Debtor be "engaged in commercial or business activities." The second reins in the general requirement quite substantially: half or more of the Debtor's aggregate debt must have arisen from those same "commercial or business activities." The requirements must be read in tandem.

1.    **"Commercial or Business Activities" Is an Exceedingly Broad Phrase**.

The phrase "commercial or business activities" is unique from a federal statutory perspective. The term does not appear in any current federal statute except for the Bankruptcy Code: Sections 1182(1)(A) and 101(51D), both of which pertain to small business debtors.[67] Since the phrase "commercial or business activities" is not expressly defined in the Bankruptcy Code and the UST challenges the point in the Eligibility Objection, the Court must engage in a statutory interpretation exercise.

When construing a statute, the Court employs a fair reading method that dictates the primacy of the statutory text. The inquiry must center on the "language of the

---

[67]    Section 707(b)(5)(C) contains a similar phrase in defining a "small business": "commercial or business activity."

statute itself." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).  The starting place is the "plain" or "ordinary" meaning of the text.  *Clark v. Rameker*, 573 U.S. 122, 127 (2014); *Hamilton v. Lanning*, 560 U.S. 505, 513 (2010).  And, the Court's duty is "to give effect, if possible, to every clause and word of a statute."  *U.S. v. Menasche*, 348 U.S. 528, 538-39 (1955) (quoting *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152 (1883)); *Lowe v. SEC.*, 472 U.S. 181, 207 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute.").

None of the parties to this dispute really explained the term "commercial or business activities," except that the Debtor and the Subchapter V Trustee both contended that the concept is very encompassing.  The Court concurs and concludes that the plain or ordinary meaning (*i.e.,* the meaning understood by a typical speaker of the English language) of the phrase "commercial or business activities" is exceptionally broad.

The Court decides from review of the text, and applying ordinary or plain meaning, that the term "commercial or business activities" means any private sector actions related to buying, selling, financing, or using goods, property, or services, undertaken for the purpose of earning income (including by establishing, managing, or operating an incorporated or unincorporated entity to do so).  "Commercial or business activities" may be contrasted with sovereign or governmental activities which a private-sector actor may not perform.  Furthermore, consumer consumption transactions generally are not considered to be "commercial or business activities" (at least from the perspective of the consumer debtor) since such transactions are not undertaken to earn income. *See Sullivan*, 2021 WL 1250805, at *2-5 (suggesting that "consumer debt" is not "commercial or business" debt).  So, in the end, "commercial or business activities" covers a lot.

Textual clues in Section 1182(1)(A) also support such an expansive view of the "commercial or business activities" requirement.  For example, the statute contains a parenthetical which excludes from eligibility "a person whose primary activity is the business of owning single asset real estate."  At least two lessons can be gleaned from that parenthetical.  First, qualifying "business activity" generally can include "owning" something (other than "single asset real estate") such as owning equity in a company or owning a fleet of taxis.  Second, Congress used the word "primary" as a qualifier in the parenthetical but not the main part of the text.  The use of "primary" in one place but not the other suggests that "commercial or business activities" do not need to be the "primary" activities of a debtor.  It will be enough if the debtor engaged in some "commercial or business activities" provided that all the other elements of Section 1182(1)(A) are met.

Congress chose to use an extremely broad phrase:  "commercial or business activities," without further qualifiers.  The absence of qualifiers does not suggest, however, that the judiciary should impose its own limits or exclusions where Congress has imposed none.  Instead, under the "general-terms canon" of statutory interpretation,

"the presumed point of using general words is to produce general coverage — not to leave room for courts to recognize ad hoc exceptions . . . .  [I]n the end, general words are general words, and they must be given general effect."  Antonin Scalia and Bryan A. Garner, READING LAW:  THE INTERPRETATION OF LEGAL TEXTS 101 (Thompson/West 2012) [hereinafter, "READING LAW"].  Utilization of general words "demonstrates breadth." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)).

In any event, the Court derived the foregoing understandings of the phrase "commercial or business activities" primarily from the text and considerations of the language used by Congress.  However, the Court also has considered multiple other sources, including dictionaries, statutes, and case law, which all lead to the conclusion that the phrase "commercial or business activities" is very broad and encompassing.

### a.   <u>Dictionary Definitions</u>.

According to the Supreme Court, dictionaries can help determine the ordinary meaning of words and phrases contained in the Bankruptcy Code.  *City of Chicago, Illinois v. Fulton*, 141 S. Ct. 585, 590 (2021) (using dictionaries to define words "act" and "exercise" in Bankruptcy Code); *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) (using dictionaries to define words "statement" and "respecting" in Bankruptcy Code); *Baker Botts L.L.P. v. ASARCO LLC,* 576 U.S. 121, 128 (2015) (using dictionaries to define word "services" in Bankruptcy Code); *Clark*, 573 U.S. at 127 (using dictionaries to define words "retirement" and "funds" in Bankruptcy Code); *Ransom*, 562 U.S. at 69 (using dictionaries to define word "applicable" in Bankruptcy Code).  Unfortunately, dictionaries generally define words — not phrases such as "commercial or business activities."  But, the Court can consider the constituent parts of the entire phrase:  the adjective "commercial"; the adjective "business"; and the noun "activities."

One of the more prominent and popular United States dictionaries frequently referenced by the Supreme Court as authoritative defines "commercial" as "of, in, or relating to commerce."  WEBSTER'S THIRD NEW INT'L DICTIONARY 456 (G. & C. Merriam Co. 1968).  And "commerce" means "the exchange or buying and selling of commodities."  *Id*.  Other definitions of "commercial" and "commerce" are similar.  *See* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 370 (Houghton Mifflin Harcourt 5th ed. 2011) ("commercial" means "of or relating to commerce"; "commerce" means "the buying and selling of goods"); Bryan A. Garner, BLACK'S LAW DICTIONARY 325 (Thompson Reuters 10th Ed. 2014) ("commercial" means "of, relating to, or involving the buying and selling of goods").

The word "business" means "usu. commercial or mercantile activity customarily engaged as a means of livelihood."  WEBSTER'S THIRD NEW INT'L DICTIONARY 302 (G. & C. Merriam Co. 1968).  Or, put another way, "business" means "the activity of buying and selling commodities, products, or services" or "a specific occupation or pursuit."  AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 252 (Houghton Mifflin

Harcourt 5th ed. 2011); *see also* Bryan A. Garner, BLACK'S LAW DICTIONARY 239 (Thompson Reuters 10th ed. 2014) ("business" means "a commercial enterprise carried out for profit; a particular occupation or employment habitually engaged in for livelihood or gain").

So, the words "commercial" and "business" are clearly synonyms. But "business" might be just a little bit broader in the sense of encompassing services (in addition to goods) and the idea of earning income through occupation or employment. As used in Section 1182(1)(A), both "commercial" and "business" modify "activities." The word "activities" mainly connotes "actions," "functions," or "processes." *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 22 (G. & C. Merriam Co. 1968); *see also* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 17 (Houghton Mifflin Harcourt 5th ed. 2011) (similar). "Activities" is plural. So, that means more than just one event and suggests continuous, recurring, or ongoing action. Finally, the conjunction "or" in the phrase "commercial or business activities," expands the phrase to include as alternatives both "commercial activities" and "business activities."

Interpretation of statutory phrases can be aided by considering the definitions of each of the words in a phrase; but simply stringing separate dictionary definitions together is not enough and might lead in the wrong direction. Instead, the Court must consider context and purpose in applying definitions. The phrase "commercial or business activities" is located in the Bankruptcy Code. So, the overall context is the economic or financial sphere. The term "commercial or business activities" also is preceded by the word "person." And since "person" includes both individuals and entities (both incorporated and unincorporated), that means that "commercial or business activities" are the types of actions which can be performed by either individuals or companies.

In any event, the Court observes from the dictionary definitions that "commercial or business activities" is a very broad and encompassing phrase. Such definitions further support the Court's own previously-explained ordinary meaning conclusion.

### b.   **Statutory Analogs.**

The specific phrase "commercial or business activities" cannot be found in any federal statutes other than Sections 1181(1)(A) and 101(51D) of the Bankruptcy Code. However, reference to analogous phrases in other statutes may inform the Court's understanding of the terminology.[68] Since the text of the Bankruptcy Code should be construed consistently and as a whole, the Court starts its statutory search for analogous provisions in the Bankruptcy Code. *See* READING LAW at 167 (explaining the "whole-text cannon" and that the text must be construed as a whole).

---

[68]   Looking to other statues for meaning clearly is not dispositive since the same word or phrase may be defined differently statute by statute. And, the context (which matters) may vary greatly. However, being careful to recognize the foregoing, helpful clues still may emerge.

The Bankruptcy Code does not provide much help with analogous provisions, except in Section 1304. That part of the Bankruptcy Code deals with "Adjustment of Debts of an Individual With Regular Income." Assuming that a debtor is eligible for protection under Chapter 13, Section 1304 provides some guidance about what a Chapter 13 debtor who is "engaged in business" can do. Under Section 1304(a): "A debtor that is self-employed and incurs trade credit in the production of income from such employment is engaged in business." Section 1304(b) generally allows "a debtor engaged in business" to continue to "operate the business." None of this is directly applicable to Subchapter V. However, Section 1304(a) suggests that incurring trade credit is a type of "business" activity and also makes clear that the production of income is an important aspect of business.

Outside of bankruptcy, the Court has considered other federal statutes dealing with a component part of the phrase "commercial or business activities": "commercial activities." The term "commercial activities" is used in a few dozen federal statutes, usually in the context of distinguishing "commercial activities" from governmental action. *See, e.g.*, 33 U.S.C. § 2321(a) (activities performed by personnel in connection with the operation and maintenance of navigation or hydroelectric power generating facilities at Corps of Engineers water resources projects "are to be 'considered as inherently governmental functions and not commercial activities.'"). And, some statutes present very broad definitions. *See, e.g.*, 10 U.S.C. § 431(c)(1) ("commercial activities" includes "the acquisition, use, sale, storage and disposal of goods and services"; "entering into employment contracts"; and "establishing corporations, partnerships, and other legal entities").

Perhaps the most well-known use of the term "commercial activities" in a federal statute is in the Foreign Sovereign Immunities Act (the "FSIA"), which endorses the view that foreign states are "not immune" "insofar as their commercial activities are concerned." 28 U.S.C. § 1602; *see also* 28 U.S.C. § 1605(a)(2) (foreign state "shall not be immune . . . in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state . . . .). The Supreme Court construed the phrase "commercial activities" under the FSIA in a series of important decisions. *See, e.g.*, *Saudi Arabia v. Nelson,* 507 U.S. 349 (1993); *Republic of Argentina v. Weltover*, 504 U.S. 607 (1992). According to the Supreme Court, the general thrust of the FSIA "commercial activities" exception is that "a foreign state engages in commercial activity . . . only where it acts 'in the manner of a private player within' the market." *Nelson*, 507 U.S. at 360 (quoting *Weltover*, 504 U.S. at 614). And, the focus is on the "nature," not the "purpose," of the activity. *Weltover*, 504 U.S. at 614; 28 U.S.C. § 1603(d). Recognizing that foreign relations is quite far afield from bankruptcy, the Court still derives from the foregoing that "commercial activities" do not include traditional governmental activities. So, for example, a law enforcement officer performing her job generally is not engaged in a "commercial activity." On the other hand, a private player (such as an individual or company) involved in the private economy and marketplace is engaging in "commercial activity." The Supreme Court's construction of the "commercial activities" phrase seems quite expansive.

Another obvious statutory source that bears on the meaning of "commercial activity" is the Uniform Commercial Code adopted in almost all United States jurisdictions. When lawyers hear the word "commercial," they almost reflexively turn to the Uniform Commercial Code. In Colorado, the Uniform Commercial Code is codified at Title 4, COLO. REV. STAT. The Uniform Commercial Code covers a vast array of topics, including sales of goods and products; leases; negotiable instruments; bank deposits and collections; funds transfers; letters of credit; bulk transfers; investment securities; secured transactions; and more. The Uniform Commercial Code certainly suggests that all of the foregoing are "commercial activities."[69]

## 2.      The Debtor "Engaged in Commercial or Business Activities."

Armed with the foregoing understanding of the phrase "commercial or business activities," the Court returns to bankruptcy and the question:  does the Debtor meet the Section 1182(1)(A) eligibility mandate of being a "person engaged in commercial or business activities"?  The answer requires the Court to consider both temporal and substantive issues.

### a.      The Court Must Assess Whether the Debtor Engaged in "Commercial of Business Activities" as of the Petition Date.

In terms of timing, the Court must decide when to make the call:  as of the Petition Date or some other time period. During oral argument, the Debtor, the UST, the Subchapter V Trustee, and Sunflower Bank all agreed that the Court must assess whether the Debtor "engaged in commercial or business activities" as of the Petition Date. The Court concurs. Focusing again on the text of Section 1182(1)(A), the phrase "engaged in" (which precedes "commercial or business activities) is a past participle used as an adjective to describe the present state of the noun "person." *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1722-23 (2017) (construing the phrase "debts 'owed . . . another'" and holding that "past participles like 'owed' are routinely used as adjectives to describe the present state of a thing"); *U.S. v. Barbeito*, 2010 WL 2243878, at *16 (S.D. W. Va. June 3, 2010) (construing the "adjectival phrase" "engaged in" and concluding that "the term 'engaged in' connotes that the thing is 'presently engaged' in the activity.") So, it stands to reason that the Court must look at the then-present state of things as of the Petition Date.

Other parts of the Bankruptcy Code also dictate that the Court should assess the Debtor's status as of the Petition Date. The term "engaged in" frequently is used in the Bankruptcy Code to establish the eligibility (or lack of eligibility) of various persons and entities to file for certain types of bankruptcy protection. Congress generally has utilized the same linguistic formula to express eligibility:

---

[69]      The Court also has mined the Small Business Act, 15 U.S.C. § 631, searching for the meaning of the phrase "commercial or business activities" or its constituent parts. After all, the title of the Small Business Act is similar to the SBRA. However, other than a broad definition of "small-business concern" (15 U.S.C. § 632(a)(1)), the Court did not find much helpful in the Small Business Act.

_____ "means" a person or entity "engaged in" [an activity].

For example, Congress provided under Sections 109(b) and (d) that "a railroad" may file for bankruptcy relief under Chapter 11 but not Chapter 7, using the following definition: "[t]he term "railroad" *means* common carrier by railroad *engaged in* the transportation of individuals or property . . . ."  11 U.S.C. § 101(44) (emphasis added).  Similarly, Congress stated in Section 109 that a "foreign insurance company, *engaged in* such [insurance] business in the United States" may not be a Chapter 7 debtor.  11 U.S.C. § 109(b)(3) (emphasis added).  Also in Section 109(f), Congress provided that a "family farmer" or a "family fisherman" may file for a specialized form of bankruptcy, Chapter 12, following the same eligibility pattern:

> The term "'family farmer" *means* . . . individual . . . *engaged in* a farming operation . . . .

> The term "family fisherman" *means* . . . an individual . . . *engaged in* a commercial fishing operation.

11 U.S.C. §§ 101(18) and (19A) (emphasis added).

The phrase "engaged in" also is ubiquitous in other non-eligibility parts of the Bankruptcy Code.  *See* 11 U.S.C. § 101(27A) ("The term 'health care business' . . . *means* any public or private entity . . . that is primarily *engaged in* offering to the general public facilities and services [for medical care] . . . ."); 11 U.S.C. § 761(12) ("'foreign futures commission merchant' *means* entity *engaged in* soliciting or accepting orders for the purchase or sale of a foreign future . . . .").  There are even more Bankruptcy Code examples, but the point is this:  the Legislative Branch's use of the term "engaged in" in Section 1182(1)(A) was no accident.  Instead, the "engaged in" phrase is used throughout the Bankruptcy Code, and it always means the same thing:  that a person or entity is presently doing something.[70]

---

[70]    Stepping outside of Title 11 for just a moment, the Court also observes that Congress has utilized the same type of definitional formula (*i.e.,* _____ "means" a person or entity "engaged in" [an activity]) in many, many scores of federal statutes to regulate all types of *present conduct.  See, e.g.*, 7 U.S.C. § 229b(a)(1) and (2) ("The term 'producer' means any person engaged in the raising and caring for livestock or poultry . . . ."; "The term 'processor' means any person engaged in the business of obtaining livestock or poultry . . . ."); 7 U.S.C. § 6002 ("The term 'grower' means any person engaged in the production and sale of pecans . . . ."); 7 U.S.C. § 6804 ("The term "floral supplier" means a person engaged in acquiring cut flowers or cut greens . . . ."); 15 U.S.C. § 78c(a)(4) ("The term 'broker' means any person engaged in the business of effecting transactions in securities for the account of others."); 21 U.S.C. § 453(aa) ("The term 'renderer' means any person engaged in the business of rendering carcasses . . . ."); 33 U.S.C. § 1202 ("'towing vessel' means any commercial vessel engaged in towing another vessel astern, alongside, or by pushing ahead"); 49 U.S.C. § 21101(5) ("'train employee' means an individual engaged in or connected with the movement of a train, including a hostler."); 49 U.S.C. § 30501(3) and (5) ("'insurance carrier' means an individual or entity engaged in the business of underwriting automobile insurance."; "'Junk yard' means an individual or entity engaged in the business of acquiring or owning junk automobiles . . . .").

The Court's conclusion about timing is strongly supported by caselaw construing some of the foregoing parts of the Bankruptcy Code.  For example, in *Hileman v. Pittsburgh & Lake Erie Props., Inc. (In re Pittsburgh & Lake Erie Props., Inc.)*, 290 F.3d 516 (3d Cir. 2002), the appellate court considered whether a debtor qualified as a "railroad" for purposes of a "railroad reorganization."  As noted above, Section 101(44) of the Bankruptcy Code defines the term "railroad" as a "common carrier by railroad *engaged in* the transportation of individuals or property or owner of trackage facilities . . . ."  (emphasis added).  The appellate court characterized the Bankruptcy Code's definition of railroad as "using the present-tense 'engaged.'"  *Id*. at 519.  Since the statute used the present tense:

> . . . . a natural reading . . . confines the scope of application of Subchapter IV to bankruptcy petitioners who are railroads at the time of the petition or thereafter . . . .  A chapter 11 bankruptcy "case" raised by an entity that has abandoned being engaged in transporting goods and people does not on the most natural reading of this language concern a railroad, it concerns a former railroad.

*Id*.

A case construing another definition in the Bankruptcy Code also makes the same point about the linguistic meaning of the term "engaged in":  *In re McLawchlin,* 511 B.R. 422 (Bankr. S.D. Tex. 2014).  Section 101(18) of the Bankruptcy Code defines "family farmer" as an "individual . . . engaged in a farming operation [who also meets certain debt cap and income origin requirements]."  In *McLawchlin* the court considered an eligibility challenge and decided:  "To be eligible for relief, an individual must 'be engaged in a farming operation' at the time the Chapter 12 petition is filed."  *Id*. at 427. Non-bankruptcy law construing the phrase "engaged in" also is similar.  *See P.C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 84 (1979) (under Longshoremen's and Harbor Workers' Compensation Act, Supreme Court construed the phrase "person engaged in" to mean circumstances "at the time of their injuries"); *Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 269 (1977) (same); *McGray Constr. Co. v. Director, Office of Workers Comp. Programs*, 181 F.3d 1008, 1014-15 (9th Cir. 1999) (statutory phrase "person engaged in maritime employment" means "engaged" on "this job" which refers to "current employment").

The Court recognizes that there is some contrary authority cited by the Debtor in the Response suggesting that the phrase "engaged in commercial or business activities" should not be "limited" to the Petition Date:  *In re Wright*, 2020 WL 2193240 (Bankr. D.S.C. April 27, 2020).  In that case, a bankruptcy court baldly stated that "nothing [in the SBRA], or in the language of the definition of a small business debtor, limits application to debtors currently engaged in business or commercial activities."  *Id*. at *3.  However, the *Wright* court did not actually engage in a statutory interpretation exercise and did not explain its rationale.  Instead, it simply quoted a passage from a bankruptcy treatise which itself stated: "The definition of a 'small business debtor' is not

restricted to a person who at the time of filing of the petition is presently engaged in commercial or business activities . . . ."  *Id.* (quoting 2 COLLIER ON BANKRUPTCY ¶ 101.51D (16th ed. 2020)).  Subsequently, two other bankruptcy courts endorsed the *Wright* court's approach without any additional analysis.  *In re Bonert*, 619 B.R. 248, 255-56 (Bankr. C.D. Cal. 2020); *In re Blanchard*, 2020 WL 4032411, at *2 (Bankr. E.D. La. July 16, 2020).

The Court respectfully rejects such aspect of the *Wright-Bonert-Blanchard* line of cases on numerous grounds.  First, none of the decisions comes to grips with the statutory language itself, which (as explained above) dictates that "engaged in" means "presently" — as of the Petition Date.  Second, the cases also do not examine the grammar (*i.e.,* "engaged in" is a past participle used as an adjective to describe the present state of the noun "person") and do not account for analogous case law precedent focusing on similar language with *Wright,* the bankruptcy treatise COLLIER ON BANKRUPTCY, subsequently was revised to remove the very passage relied upon by the *Wright* court.  In other words, the treatise authors changed their minds and no longer argue against a temporal restriction as of the Petition Date.  Fourth, more persuasive subsequent case law construes the "engaged in" phrase as applying to the circumstances as of the Petition Date.  *In re Johnson*, 2021 WL 825156, at *6 (Bankr. N.D. Tex. Mar. 1, 2021) ("the 'engaged in' inquiry is inherently contemporary in focus"); *In re Thurmon*, 2020 WL 7249555, at *3 (Bankr. W.D. Mo. Dec. 8, 2020) (construing the SBRA and deciding that "[t]he plain meaning of "engaged in" means to be actively and currently involved.").  And, finally, even the Debtor shifted position in closing argument and conceded that whether the Debtor was "engaged in commercial or business activities" must be determined as of the Petition Date.

Although the Court must assess whether the Debtor was "engaged in commercial or business activity" as of the Petition Date, focusing only on the exact nano-second the Petition was filed is a bit too narrow.  For example, perhaps the Debtor did no work on the Petition Date itself.  So, in considering whether the Debtor was engaged in "commercial or business activity" as of the Petition Date, the Court deems relevant the circumstances immediately preceding and subsequent to the Petition Date as well as the Debtor's conduct and intent.

> **b.**     **The Debtor "Engaged in Commercial or Business Activities" as of the Petition Date.**

Having decided the temporal issue, the Court must determine whether, under the facts and circumstances in this particular Subchapter V case, the Debtor "was engaged in commercial or business activity" as of the Petition Date.  The Court employs a "totality of the circumstances" test to make the call.  *Cf. Watford v. Fed. Land Bank of Columbia (In re Watford)*, 898 F.2d 1525, 1528 (11th Cir. 1990) (adopting "totality the

circumstances" to decide whether the debtor was "engaged in a farming operation" as of the petition date).[71]

Because Hailco "was forced to cease operations and surrender its assets to its secured lender" prior to the Petition Date, the Court's decision is a difficult one. However, under the very broad scope of the phrase "commercial or business activities," the Court concludes that the Debtor was engaged in the following categories of "commercial or business activities" as of the Petition Date:  (1) "commercial or business activities" pertaining to JMI; (2) "commercial or business activities" pertaining to Hailco; and (3) "commercial or business activities" pertaining to CCIG.

With respect to JMI, the Debtor has directly owned all of the membership interests in the entity since 2012.  He owned such equity as of the Petition Date and afterward.  Non-passive ownership is a form of "commercial or business activity."  *See* 11 U.S.C. 1182(1)(A) (referring to the "business of owning"); *see also* Nicholas Karambelas, LIMITED LIABILITY COMPANIES: LAW, PRACTICE, AND FORMS ¶ 1.1 (Thompson Reuters Supp. 2021) (limited liability company "enables the entrepreneur to do business through a legal entity that maximizes flexibility in internal operations and minimizes . . . legal artifices that hamper the process of making business decisions based primarily on financial and commercial considerations").  During all relevant times, the Debtor also acted as the only manager of JMI.  Managing or directing the operations of a limited liability company is a "commercial or business activity."  The Debtor formed and managed JMI as a mechanism to obtain income including through investments.  During recent years, JMI has received income from the Fairmount Cemetery for the Debtor's service on its Board of Directors and also through management fees for Hailco (albeit that JMI suffered net losses).  JMI also owns 30 percent of Hailco.  JMI has not been dissolved under COLO. REV. STAT. §§ 7-80-801 *et seq*.  The Debtor confirmed his intention to continue operating JMI.  And, recently, JMI entered into a "Business Consulting Agreement" with SkyHelm.  The Debtor signed the new contract as Managing Member of JMI.  All the foregoing activities undertaken by the Debtor were performed in the private sector and did not constitute governmental activity.  Thus, the Debtor's actions regarding JMI (as of the Petition Date as well as shortly before and after), satisfy the Section 1182(1)(A) requirement that the Debtor was "engaged in commercial or business activities."

With respect to Hailco, the company was engaged in the sale of automotive hail repair services to the general public.  The Debtor has indirectly owned a minority interest in the entity (through JMI) for several years.  He indirectly owned such equity as

---

[71]     Several of the parties also have argued that the Court should decide what Congress had in mind and consider the SBRA legislative history.  However, the Court should not decide "what the legislature meant . . . [but] only what the statute means."  Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 HARV. L. REV. 417, 419 (1899).  In fact, the exercise of trying to divine intent from legislative statements (whether from floor speeches, debates, or committee reports) is a sort of fiction.  *See* READING LAW 394 ("The use of the term *legislative intent* encourages this search for the nonexistent.")  But, in this case, even if the Court wanted to seek fiction, it would be even more impossible because there is no helpful legislative history really explaining Section 1182(1)(A).  Instead, the legislative history is essentially generic.

of the Petition Date and afterward. Such non-passive ownership, albeit indirect and non-majority, constitutes "commercial or business activity." Hailco has not been dissolved under COLO. REV. STAT. §§ 7-80-801 *et seq.* During all relevant times, the Debtor also has acted as one of the managers of Hailco. He engaged in the management and operation of Hailco with the intent to earn income, even though the entity ultimately failed. Further, although Hailco was "forced to cease operations and surrender its assets to its secured lender" shortly before the Petition Date and the Debtor stopped working there as an employee, the Debtor has continued both before and after the Petition Date to perform some activities to "wind down" Hailco. Toward that end, the Court notes that as a manager of Hailco, the Debtor owes the company duties, including the duty to "[a]ccount to the limited liability company and hold as trustee for it any property, profit, or benefit derived by the member or manager in the conduct or winding up of the limited liability company business . . . ." COLO. REV. STAT. § 7-80-404(1)(a). And, as a manager of Hailco, the Debtor has the power to bind Hailco as its agent. COLO. REV. STAT. § 7-80-405(1)(b). If Hailco is dissolved, the Debtor may also have additional obligations. COLO. REV. STAT. § 7-80-803. In any event, both before and after the Petition Date, the Debtor has been engaged in the Wind Down Work, including: interacting with lenders and a landlord; helping cleanup and turnover lease premises; assisting with payroll; dealing with tax accountants and tax issues; organizing and storing business records; and performing some other work. All the foregoing activities undertaken by the Debtor were performed in the private sector and do not constitute governmental activity. Although there is not any intention that Hailco continue active operations in the future, the foregoing Wind Down Work as well as the Debtor's other actions qualify as "commercial or business activities" of the Debtor within the broad and expansive meaning of the term under Section 1182(1)(A) as of the Petition Date.

Since Hailco stopped operations about a month before the Debtor's bankruptcy filing, the Court's call is close. There is some compelling authority which gives the Court substantial pause: *Thurmon*, 2020 WL 7249555; and *Johnson*, 2021 WL 825156. In *Thurmon*, the individual debtors owned a majority interest in a limited liability company which operated two pharmacies. About three months before they filed for bankruptcy, the debtors "closed the pharmacies and sold almost all of the business assets." By the time of the debtors' bankruptcy filing, the entities "had no employees, no customers, no vendors and no intent to resume business activities." *Thurmon*, 2020 WL 7249555, at *1-2. But, the limited liability company remained in good standing. The *Thurmon* court decided that the debtors were not eligible under Subchapter V because they "were not as a matter of fact or law 'engaged in commercial or business activities' on the day they filed bankruptcy." *Id.* at *5. That all sounds quite right and very similar to this case. But similar is not the same. Ultimately, The Court distinguishes *Thurmon* because of a different factual record. In this case, unlike in *Thurmon*, the Debtor had two limited liability companies. JMI did not "cease business" and is still operating and receiving income. With respect to Hailco, even though the entity stopped its active business operations, the Debtor presented a record of Wind Down Work in which the Debtor had engaged in before and after the bankruptcy filing (*i.e.*, as of the Petition Date). Each category of Wind Down Work itself constitutes "commercial or business

activities" in the broad sense:  communicating with lenders and a landlord; helping cleanup and turnover lease premises; assisting with payroll; dealing with tax accountants and tax issues; organizing and storing business records; and performing some other work.  Section 1182(1)(A) speaks only to whether the Debtor was "engaged in commercial or business activity" as of the Petition Date — not whether the Debtor was making a profit, actively operating, or intending to operate in the future.  So, the facts lead this Court in a different direction than the *Thurmon* decision, but just barely.

Regarding the Debtor's involvement with Hailco, the Court also carefully considered the opinion in *Johnson*, 2021 WL 825156.  In that case, two individual debtors filed for Chapter 7 liquidation on May 22, 2019.  They later sought to convert from Chapter 7 liquidation to Chapter 11 Subchapter V reorganization.  One of the debtors asserted that he "engaged in commercial or business activities" based on the his "*prior* ownership and management of the Defunct Companies."  *Id*. at *5 (emphasis and capitalized, defined term in original).  That debtor owned and managed seven entities (mostly limited liability companies) prior to his bankruptcy.  Two of the companies went out of "existence" in 2017; four of the entities went out of "existence" in 2018; and one of the companies ended its "existence" in 2019 about four months before the start of the bankruptcy case. *Id*. at *2.  The *Johnson* court characterized all the companies as "Defunct" and held:

> [T]he evidence is clear that each of the Defunct Companies
> had ceased all commercial and business activities prior to
> the Petition Date and that [the debtor] was not occupied with
> or otherwise busy in — *i.e.* 'engaged in' — any commercial
> or business activities with respect to the Defunct Companies.

*Id*. at *7.  Thus, the *Johnson* court found that the debtor was not eligible under Subchapter V.  The forgoing scenario is similar to the current dispute – again, similar but not the same.  From the text of the decision, the Court guesses that the *Johnson* Defunct Companies were dissolved and no longer existed as of the date when the debtor's case was filed.  After all, the court referred to the "disclosed periods of existence" for each of the companies.  *Id*. at 2.  Six out of the seven entities no longer "existed" years before the bankruptcy filing.  And, there was no evidence that the debtor was "occupied with or otherwise busy in" the Defunct Companies.  This dispute is distinguishable because, unlike in *Johnson*, the Debtor's wholly-owned company, JMI, did not "cease business" and is still operating and receiving income.  And, the Debtor presented a record of Wind Down Work in which the  Debtor had engaged before and after the bankruptcy filing, work to which he had devoted about 12 hours a month.  Each category of Wind Down Work itself constitutes "commercial or business activities" in the broad sense.  So, the facts point this Court to a different place than the *Johnson* decision.  Again, just barely.

Moving on to a final category of "commercial or business activity" – with respect to CCIG, the Debtor started working at CCIG before the Petition Date as a "Commercial Insurance Producer."  That role has continued post-petition too.  As a "Commercial

23

Insurance Producer," the Debtor is a salaried employee who sells commercial insurance products.  The Debtor does not own any equity in CCIG.  Instead, he receives a monthly salary of $11,250.00.  The Debtor's involvement with CCIG is for the purpose of obtaining income.  Under the exceptionally broad scope of the Section 1182(1)(A) "commercial or business activities" requirement, the Court concludes that the Debtor's work as a wage earner with CCIG constitutes "commercial or business activities."  After all, his role is selling a product in the private marketplace in order to make money for himself and his employer.  That is what "commercial activity" and "business activity" means.  *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 302 and 456 (G. & C. Merriam Co. 1968) ("commerce" means "the exchange or buying and selling of commodities"; business" means "usu. commercial or mercantile activity customarily engaged as a means of livelihood."); AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 252 and 370 (Houghton Mifflin Harcourt 5th ed. 2011) ("commercial" means "of or relating to commerce"; "commerce" means "the buying and selling of goods"; "business" means "the activity of buying and selling commodities, products, or services" or "a specific occupation or pursuit."); Bryan A. Garner, BLACK'S LAW DICTIONARY 239 (Thompson Reuters 10th Ed. 2014) ("business" means "a commercial enterprise carried out for profit; a particular occupation or employment habitually engaged in for livelihood or gain").[72]

The Court realizes that its legal conclusion regarding the Debtor's work for CCIG suggests that virtually all private sector wage earners may be considered as "engaged in commercial or business activities."  So be it.  In a very real sense, even employees flipping burgers at fast food restaurants are "engaged in commercial or business activities" as a part of our grand American economy in that they are helping produce and sell a product.  There is no reason that "commercial or business activities" are somehow reserved only for business titans, company owners, or management.  Every non-governmental worker has their role to play in private sector commerce and business.

Notwithstanding the seemingly radical nature of the Court's foregoing legal conclusion, that does not mean that every private sector wage earner is eligible for relief under Subchapter V of the Bankruptcy Code.  Not at all.  There is still another hurdle under Section 1182(1)(A) which is difficult to meet and which severely limits the use of Subchapter V for individuals:  "not less than 50%" of the Debtor's "aggregate noncontingent liquidated secured and unsecured debts" must have arisen from "the commercial or business activities of the [D]ebtor."  The typical hamburger artist, earning just minimum wage, will almost never be putting his own capital at risk and incurring debts which arise from his work.  So, Subchapter V will not be for everyone.

---

[72]     There is contrary authority:  *Johnson*, 2021 WL 825156.  In that case, a debtor served as an officer and employee of an entity which he also managed.  *Id.* at 3.  However, he had no ownership interest and was a "W-2 employee."  The *Johnson* court decided that the debtor was "nothing more than an employee of El Reno with heightened obligations to the company on account of his role as officer.  As such [the debtor] does not qualify as a small business debtor under [the "commercial or business activities" part of] Section 101(51D)."  *Id.* at *8.  The Court respectfully disagrees with the foregoing holding on the basis that employees can engage in "commercial or business activities" in the broad sense of Section 1182(1)(A).  Furthermore, the statute does not impose any additional requirement of ownership or control of an entity.

3.      **Most of the Debtor's Debts Arose from His "Commercial or Business Activities."**

The last Section 1182(1)(A) requirement is that "not less than 50 percent [of the Debtor's debts] . . . arose from the commercial or business activities of the debtor . . . ." Accepting the Debtor's identification of $7,396,750.09 in aggregate debt on his Schedules, half is $3,698,375.05.  So, the statutory question becomes whether $3,698,375.05 or more of the Debtor's aggregate debt "arose from the commercial or business activities of the debtor"?  Neither the UST nor Sunflower Bank actively contested this Section 1182(1)(A) issue.  However, the Court scrutinizes the element anyway.

The Court already has decided that the Debtor "engaged in" the following "commercial or business activities" as of the Petition Date: (1) "commercial or business activities" pertaining to JMI; (2) "commercial or business activities" pertaining to Hailco; and (3) "commercial or business activities" pertaining to CCIG.  But there is an important "the" in the Section 1182(1)(A) statutory text.  More than half of the Debtor's debts must have arisen from "*the* commercial or business activities of the Debtor."  So, the debt must be tied to the particular type of commercial or business activities the Debtor engaged in.

One of the categories of the Debtor's "commercial or business activities" will clearly not support Subchapter V eligibility:  his work for CCIG.  The Debtor started working as a salaried employee of CCIG just shortly before the Petition Date.  And, none of his debts "arose from" his "commercial or business activities" with CCIG.  He did have any skin in the game.

But the Debtor put himself on the line big-time for Hailco, through JMI.  The vast majority of his debts arose from guarantees he provided to support loans for Hailco. The prime example is Sunflower Bank.  On August 15, 2018, the Debtor executed an "Unconditional Guarantee" in favor of Sunflower Bank unconditionally guaranteeing payment to Sunflower Bank of up to $5,000,000 loaned by Sunflower Bank to Hailco. Sunflower Bank claims that the Debtor owes it $4,364,744.99.  There are seven other creditors who also have claims based upon the Debtor's guarantee of Hailco debt. Altogether, the claims against the Debtor premised on the Debtor's guarantees of Hailco debt total $6,388,756.03.  The total claims against the Debtor are $7,396,750.09.  Thus, the Hailco debt guarantee claims against the Debtor tally to about 86% of the aggregate claims pool — far more than the 50% required by Section 1182(1)(A).

There is only one loose end left:  did that 86% of the Debtor's debt (based on the Hailco guarantee claims) arise from "the commercial or business activities of the debtor"?  For the debt to have "ar[isen] from the commercial or business activities of the debtor," the debt must be directly and substantially connected to the "commercial or business activities" of the debtor.  *See Woods,* 743 F.3d at 698 (in Chapter 12 context, "a debt 'for' a principal residence "arises out of" a farming operation only if the debt is

directly and substantially connected to the farming operation"; using dictionary definitions of "arise" as meaning "to originate; to stem (from)" or "to result from"). In this context, the Court may also look back in time before the Petition Date to ascertain whether the debt arose from the same general types or categories of "commercial or business activity" which the Debtor was engaged in as of the Petition Date. After all, debts do not arise on the exact date a bankruptcy petition is filed. For example, the Sunflower Bank claim is based upon a guarantee made two years before the Petition Date. The Court determines that the Debtor's debt based on the Hailco guarantee claims "arose from" the Debtor's "commercial or business activities" with both Hailco and JMI (which owned Hailco). The Court's conclusion is almost self-evident. No one would put millions of dollars of personal guarantees on the line for a company unless it was to advance the guarantor's own commercial and business interests. Put another way, the Debtor must have thought Hailco would succeed and the Debtor would receive a return (through his indirect equity ownership as well as income for employment and management) — or he would not have put up the guarantees. The guarantees also allowed Hailco to obtain financing to operate. Making financial guarantees for a company in which the Debtor has an indirect equity interest is itself a "commercial or business activity." And, of course, the Debtor (as a manager of both JMI and Hailco and a former employee of Hailco) was engaged in all the other types of "commercial or business activities" pertaining to JMI and Hailco noted above, plus more, because the guarantees were given by the Debtor when Hailco was still operating. Based on the foregoing, as well as the failure of the UST and Sunflower Bank to really contest the point, the Court finds that the Debtor met the last Section 1182(1)(A) hurdle because far more than 50% of his debts "arose from the commercial or business activities of the debtor."

## VI.   Conclusion.

This dispute has involved a number of novel and challenging legal issues in the context of new legislation. The Court appreciates the able advocacy of counsel for all the interested parties. However, in the end and for the reasons set forth above, the Court concludes that the Debtor has met his obligation to establish his eligibility as a small business debtor under Section 1182(1)(A) and the SBRA because he is a person who was engaged in commercial or business activities (as of the Petition Date) whose debts are less than $7,500,000 and more than half of which arose from the commercial or business activities of the Debtor. Accordingly, the Court:

DENIES and OVERRULES the Eligibility Objection. The Debtor may proceed toward confirmation of his Plan.

DATED this 15th day of April, 2021.      BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge